No. 01-832

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 247

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

MICHAEL J. DANIELS,

        Defendant and Appellant.


APPEAL FROM:    District Court of the Eighth Judicial District,
                      In and for the County of Cascade, Cause No. BDC-00-094,
                      The Honorable Kenneth R. Neill, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

                Lawrence A. LaFountain, Attorney at Law, Great Falls, Montana

        For Respondent:

                Hon. Mike McGrath, Attorney General; Pamela P. Collins,
                Assistant Attorney General, Helena, Montana

                Brant Light, Cascade County Attorney, Great Falls, Montana


                      Submitted on Briefs:  June 19, 2003

                                  Decided:  September 18, 2003

Filed:

_____
                      Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     The State charged Defendant Michael J. Daniels (Daniels) with one count of felony robbery in the Eighth Judicial District Court, Cascade County. After a jury trial, Daniels was convicted and the court sentenced Daniels to 45 years in prison with 10 years suspended. Daniels appeals his conviction. We affirm.

¶2     The issues on appeal are:

¶3     1. Did the State's comments during closing argument constitute plain error?

¶4     2. Did the District Court commit plain error when it permitted Alfred Joe Smith (Smith) to testify during Daniels' trial?

¶5     3. Did the District Court commit plain error when it gave Jury Instruction #6?

¶6     4. Was Daniels' counsel ineffective for his alleged failure to interview potential defense witnesses and for his failure to object to certain evidence at trial?

### FACTUAL AND PROCEDURAL BACKGROUND

¶7     On or about February 18, 2000, 16-year-old Cole Tolliver (Tolliver) and his friend Gary Houser (Houser) were driving together after leaving a mutual friend's house at 11 p.m. in Great Falls. The pair decided to stop at Keith's Country Store to purchase something to drink. Tolliver pulled into the store parking lot and parked in the rear of the store. Houser went inside and Tolliver followed, but returned to his car when he realized he left his money there.

¶8     As Tolliver collected the money, two young men exited a nearby vehicle. One of the young men, who Tolliver later identified as Daniels, pointed a laser-sighted handgun at

2

Tolliver and ordered him to get on the ground and give him all of his money. Tolliver got down and gave the money to him. Daniels took the money, and the two perpetrators returned to their car. The second man, who Tolliver later identified as Smith, visibly displayed a police scanner and warned Tolliver to not call the police or he would be killed. The men then drove away from the store and Tolliver did not obtain identification plate numbers for the assailants' vehicle. Houser returned from the store, and Tolliver told Houser about the assault as they drove away.

¶9 Later that evening, Tolliver returned home and told his parents about the robbery. Tolliver's parents insisted that he report the robbery to the police, but no one actually reported the robbery initially. Two days after the robbery, Tolliver went with his mother and reported the incident to the police. At the police station, Tolliver gave a description of the perpetrators to Officer Tito Rodriguez. Rodriguez then provided Tolliver with photos of potential suspects, and Tolliver identified Daniels and Smith as the perpetrators.

¶10 The Great Falls Police Department began searching for Daniels and Smith and considered them armed and dangerous. On February 21, 2000, Officers Hollis and Wells observed Daniels and Smith at the Holiday Village Mall. When Daniels and Smith saw the officers, they immediately left the mall.

¶11 On February 22, 2000, Detective Don Scheele (Scheele) met with Macedonia Mondragon (Mondragon). According to Scheele, Mondragon told him that she had seen Daniels and Smith with a laser-sighted pistol and a sawed-off shotgun.

¶12 On February 25, 2000, police apprehended Smith. Initially, he provided no statement

3

to police. However, on September 14, 2000, Smith admitted that Daniels was with him during the robbery.

¶13    On February 29, 2000, police, acting on a tip that Daniels was hiding at Lisa Cole's (Cole) house, contacted Cole by telephone and requested permission to search her home. Cole agreed to the search and police arrived and searched her house. Police discovered Daniels, who was hiding inside a couch, and arrested him. At the time, Daniels denied his identity, stated his name was Moe, and stated the tattoo on his shoulder with the initials M.D. actually showed M.O. However, Daniels indicated to police that he had ingested drugs before the officers arrived and he started to vomit. The officers called an ambulance. Daniels was taken to the hospital, treated, and later released into police custody.

¶14    In custody, officers provided Daniels with a warning against self-incrimination, and Daniels decided to talk with the officers. Daniels stated that he was at the store with Jerri Matye (Matye), a friend, in a different car than Smith. He stated that Smith was also at the store in another car. Daniels said that Tolliver approached him outside the store and asked him to buy some beer for him, but Daniels declined the request because he was not old enough to buy beer. Daniels said that Tolliver then walked over to Smith's car and presumably made a similar request, at which point Tolliver gave Smith his money and then raised his hands as if being held at gunpoint. Daniels said he saw Smith drive away from the store parking lot. At that point, Daniels told Matye to leave the area, and Matye drove away.

¶15    In September 2000, Smith pled guilty to Tolliver's robbery. As part of the plea agreement, Smith agreed to provide a tape-recorded statement regarding the events of the

4

robbery and agreed to testify truthfully against Daniels. Smith provided a statement and testified against Daniels at his first trial. He also testified at his change of plea hearing regarding his participation in the robbery. Smith testified that Daniels was present at the robbery, held a handgun, and demanded the money.

¶16 Daniels pled not guilty and the case went to jury trial on September 18 to 20, 2000. The first trial resulted in a hung jury. A retrial was held February 20 to 21, 2001. At the second trial, the State called Smith to testify. Smith testified that his prior testimony regarding Daniels' involvement in the crime was false in that the actual person who was with Smith at the time of the robbery was his cousin John Bearstone. Smith testified that John Bearstone, not Daniels, was responsible for the crime. Smith described John Bearstone as a Native American, 19 or 20 years old, six feet tall, with black hair.

¶17 The State then cross-examined Smith using his prior statements. The State also presented other testimony to rebut Smith's statements. Detective Beecroft testified that Smith had never previously mentioned John Bearstone's name when he talked to the police, and that after some investigation, Beecroft was unable to locate or identify any person by the name of John Bearstone. Beecroft did admit, however, that if John Bearstone lived outside of Great Falls or had no criminal record, he would probably not know who John Bearstone was.

¶18 After the State rested, Daniels did not call any witnesses. During closing argument, the prosecutor discussed Smith's change of testimony and the existence of "John Bearstone," stating:

> Now [Smith's] got motive to try [to] implicate somebody who doesn't exist because he knows [we] can't go after an imaginary person. John

5

Bearstone is general for Alfred Smith. It's convenient that he just mentioned his name for the first time today. . . .

[John Bearstone's] an imaginary person . . . Detective Beecroft who's been the follow-up aversion on this case, looked for a John Bearstone, 19 or 20 years old, Native American male on the Blackfeet reservation. That's the reservation we got from Alfred Smith on the stand. There is no such person. We didn't find any such person.

Detective Beecroft works in narcotics, he knows the gangs. He knows the people in the gangs, knows their gang members and he knows who they associate with. That's his job, ladies and gentlemen. If this person were real, wouldn't you think that Detective Beecroft would have at least heard this name before?

Daniels' counsel did not object to the prosecutor's comments.

¶19 The jury found Daniels guilty. Daniels now appeals.

## STANDARD OF REVIEW

¶20 Where the defendant raises the plain error doctrine to request our review of issues that were not objected to at the district court level, our review is discretionary. *State v. Earl*, 2003 MT 158, ¶ 25, 316 Mont. 263, ¶ 25, 71 P.3d 1201, ¶ 25. In *State v. Finley* (1996), 276 Mont. 126, 137, 915 P.2d 208, 215, *overruled on other grounds by State v. Gallagher,* 2001 MT 39, 304 Mont. 215, 19 P.3d 817, we held:

[T]his Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made and notwithstanding the inapplicability of the § 46-20-701(2), MCA, criteria, where failing to review the claimed error at issue may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process.

The plain error doctrine is to be employed sparingly, on a case-by-case basis, pursuant to the narrow circumstances articulated in *Finley. Finley,* 276 Mont. at 138, 915 P.2d at 215. In

6

order to determine the applicability of the plain error doctrine, we consider the totality of circumstances of each case. *State v. Brown*, 1999 MT 31, ¶ 12, 293 Mont. 268, ¶ 12, 975 P.2d 321, ¶ 12.

¶21 We review claims of ineffective assistance of counsel following the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Dawson v. State*, 2000 MT 219, ¶ 20, 301 Mont. 135, ¶ 20, 10 P.3d 49, ¶ 20. Under the standard, a defendant must show both that the counsel's performance was deficient and that this performance prejudiced the defense and denied the defendant a fair trial such that the result of the proceeding would have been different. *Dawson*, ¶ 20. We presume counsel's performance was effective. *State v. Niederklopfer*, 2000 MT 187, ¶ 19, 300 Mont. 397, ¶ 19, 6 P.3d 448, ¶ 19.

¶22 We review jury instructions in criminal cases to determine whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case. *State v. Courville*, 2002 MT 330, ¶ 15, 313 Mont. 218, ¶ 15, 61 P.3d 749, ¶ 15. A district court has broad discretion when issuing instructions to the jury, and in order to constitute reversible error, the instructions must prejudicially affect the defendant's substantial rights. *Courville*, ¶ 15.

## DISCUSSION

¶23 1. Did the State's comments during closing argument constitute plain error?

¶24 Daniels contends his trial was fundamentally unfair due to the prosecutor's statements during closing argument regarding John Bearstone. Specifically, Daniels asserts the

7

prosecutor improperly vouched for the credibility of Detective Beecroft and attacked the credibility of Smith. In addition, Daniels contends the prosecutor's comments about the existence or non-existence of John Bearstone were outside of the scope of evidence presented and constituted vouching to the extent the prosecutor informed the jury which version of facts he knew to be true. Daniels further contends the State's cross examination of Smith regarding his agreement to testify truthfully also constituted prosecutorial vouching.

¶25 The State contends that Daniels failed to object to the prosecutor's comments at trial, and that, therefore, Daniels must demonstrate plain error to constitute reversible error. The State further contends Daniels has not shown, even if in error, that the prosecutor's comments would reach a level of manifest miscarriage of justice or show any fundamental unfairness at the trial. In addition, the State contends the prosecutor's comments were appropriate comments on the evidence presented to the jury.

¶26 We agree with the State. Although it is improper for the prosecution to comment on evidence not in the record or to offer personal opinions regarding the credibility of a witness, it is proper "to comment on conflicts and contradictions in testimony, as well as to comment on the evidence presented and suggest to the jury inferences which may be drawn therefrom." *State v. Gladue*, 1999 MT 1, ¶¶ 14-15, 293 Mont. 1, ¶¶ 14-15, 972 P.2d 827, ¶¶ 14-15. Further, as mentioned, we will not review a claim that was not properly preserved for appeal unless it constitutes plain error. *Finley,* 276 Mont. at 138, 915 P.2d at 215.

¶27 In this case, our review of the record indicates Daniels fails to demonstrate the

prosecutor's comments amounted to any error, much less a fundamental unfairness resulting in plain error. Accordingly, Daniels does not meet the narrow criteria required and we decline to invoke our discretionary plain error review. *State v. Harris*, 1999 MT 115, ¶ 12, 294 Mont. 397, ¶ 12, 983 P.2d 881, ¶ 12.

¶28 We also note here that we will not set a precedent of presenting full analysis whenever a party asserts that an issue not properly preserved for appeal constitutes plain error. Such an approach would defeat the rule requiring an argument to be preserved for appeal and would allow a party to make virtually any argument on appeal.

¶29 2. Did the District Court commit plain error when it permitted Smith to testify during Daniels' trial?

¶30 Daniels next contends that Smith's testimony was so inconsistent as to render it highly unreliable and as a result, Daniels' conviction was fundamentally unfair. He argues Smith's testimony at either trial is so inherently untrustworthy that it should not have been allowed as evidence to support a conviction. Daniels relies on *State v. White Water* (1981), 194 Mont. 85, 89-90, 634 P.2d 636, 638-39, for his proposition that unreliable evidence cannot serve as basis for a conviction.

¶31 The State contends this testimony was not objected to and that this argument is raised for the first time on appeal. Therefore, the State once again points out this issue cannot justify a reversal of the conviction without plain error. The State also contends the use of Smith's prior testimony was permissible pursuant to Rule 801, M.R.Evid. Further, the State points out that even assuming Smith's statements were inherently unreliable, Tolliver's direct

testimony also supported the conclusion that Daniels committed the robbery so Daniels' conviction was not solely based on Smith's prior inconsistent statements.

¶32 Again, we agree with the State and note there was no fundamental unfairness such that plain error applies. Because Smith's testimony at the second trial was inconsistent, the State was entitled to point out these inconsistencies to the jury under Rule 801(d)(1)(A), M.R.Evid. Which version of Smith's testimony to believe was for the jury. Because there was other testimony pointing to Daniels as the perpetrator of the robbery, the rule from *White Water* regarding prior inconsistent statements does not apply. Again, there is no error, much less plain error, in presenting different stories of the same witness for a jury's consideration.

¶33 3. Did the District Court commit plain error when it gave Jury Instruction #6?

¶34 Daniels contends the District Court erred when it read Jury Instruction #6 to the jury and therefore violated his right to a fair trial. Specifically, Daniels contends the text of the instruction, which instructed the jury to view with distrust the testimony of one legally accountable for the same crime, i.e. Smith's testimony, could be construed to instruct the jury to view with distrust Daniels' exculpatory statements to police officers immediately after his arrest since he implicated Smith in his statements to the police.

¶35 The State contends that while Daniels objected to the instruction at trial, the reason given the trial court for the objection was that Smith's testimony had changed and was no longer inculpatory, thereby negating any need for the instruction. Thus, the State asserts Daniels should not now be able to argue against the instruction under a new theory that was not presented to the District Court. Again, the State asserts plain error does not apply. We

agree.

¶36    A party may not change their theory on appeal from that advanced in the district court. *State v. Henderson* (1994), 265 Mont. 454, 458, 877 P.2d 1013, 1016.  In order to constitute the plain error required for reversal in this case, the instructions must prejudicially affect the defendant's substantial rights such that there is a manifest miscarriage of justice or a fundamental unfairness.  Again, our review of the record indicates that no error occurred here at all and we decline to invoke our discretionary review.

¶37    Before we turn to the final issue, we note that Daniels contends his counsel was ineffective for failing to object as necessary to preserve the above arguments.  However, as discussed above, our review of the record indicates that none of those issues amount to error, let alone plain error.  Ergo, Daniels' counsel was not ineffective regarding those issues.

¶38    4. Was Daniels' counsel ineffective for his alleged failure to interview potential defense witnesses and for his failure to object to certain evidence at trial?

¶39    Daniels now contends his counsel was ineffective because he failed to investigate and interview certain witnesses in order to present a case in chief.  Daniels contends his counsel failed to interview Matye to confirm a potential alibi and failed to interview Houser to show Tolliver's story was not credible.  Daniels also contends that his counsel was ineffective for not interviewing Smith prior to trial to discover that he would be changing his story.  Daniels further contends that his counsel was ineffective when he failed to object to questioning regarding comments made to Tolliver by friends and others that suggested a threat of harm to Tolliver if he pursued charges against Daniels.  In addition, Daniels contends his counsel

11

was ineffective when he failed to object to the testimony of several witnesses who made comments unrelated to the current charges but instead implied that Daniels was a dangerous person, a gang member, and a drug user. Daniels contends that the record suggests there was no legitimate purpose for the presentation of this testimony except to show that Daniels was of bad character, in violation of Rule 404, M.R.Evid.

¶40 The State contends Daniels cannot demonstrate on direct appeal that his counsel's actions were not objectively reasonable or that there was a reasonable probability that his counsel's errors caused a prejudicial result. Therefore, the State asserts Daniels' conviction must be affirmed. We agree, with the caveat that some of Daniels' ineffective assistance of counsel claims cannot be properly reviewed on direct appeal.

¶41 In analyzing ineffective assistance of counsel claims, we must first consider whether the record is sufficient to determine whether counsel was ineffective. "[W]here ineffective assistance of counsel claims are based on facts of record in the underlying case, they must be raised in the direct appeal and, conversely, where the allegations of ineffective assistance of counsel cannot be documented from the record in the underlying case, those claims must be raised by petition for post-conviction relief." *State v. White*, 2001 MT 149, ¶ 12, 306 Mont. 58, ¶ 12, 30 P.3d 340, ¶ 12 (citing *Hagen v. State*, 1999 MT 8, ¶ 12, 293 Mont. 60, ¶ 12, 973 P.2d 233, ¶ 12). We stated: "The underlying principle of the foregoing rule is that a silent record cannot rebut the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . Absent a complete record, this Court will not speculate on counsel's alleged errors." *White*, ¶ 13 (citations omitted).

¶42 In *White*, we held that the operative test is whether or not the record contains the answer as to why counsel took, or failed to take, action in providing a defense. *White*, ¶ 20. However, we also noted that failing to adequately investigate is usually a non-record based claim. *White*, ¶ 18. In contrast, we also noted that failure to object to testimony is generally record-based and appropriate for direct appeal. *White*, ¶ 15.

¶43 With respect to Daniels' first contention that his counsel failed to interview and determine the potential testimony of Matye, Houser, and Smith, the record here is insufficient to show why Daniels' counsel did not call these people as witnesses. With the present record, we can only speculate as to what investigation Daniels' counsel undertook or why he made the decisions he made. Therefore, we cannot conclude, pursuant to the test set forth in *Strickland*, that Daniels' counsel was ineffective on direct appeal.

¶44 In contrast, regarding Daniels' claims that his counsel failed to properly object to certain testimony, we conclude the present record provides adequate information to review Daniels' claims on direct appeal. We further conclude that Daniels' counsel was not ineffective for failing to object. As to Tolliver's testimony that he received threats from others due to his report to police regarding the robbery, the record shows that Tolliver was adequately cross-examined by Daniels' counsel. Upon cross-examination by Daniels' counsel, Tolliver admitted that no one made any direct threats. In fact, Tolliver testified the threats were generalized warnings from friends and peers of Tolliver's. On redirect, Tolliver further conceded that neither Daniels nor Smith made any threats to Tolliver aside from the time of the alleged robbery. Defense counsel's approach to Tolliver's testimony fits well

within the accepted practices of trial attorneys, and nothing suggests the jury would have reached a different verdict on the basis of Tolliver's testimony regarding the warnings from friends.

¶45    We also conclude that counsel's failure to object to comments regarding Daniels being considered armed or implying Daniels was a gang member or drug user did not constitute ineffective assistance.  We have held counsel is not ineffective for failing to object to testimony that is properly admissible.  *Dawson*, ¶ 108.  In this case, although Daniels asserts the objectionable testimony was only admitted for the purpose of showing his bad character, the record demonstrates otherwise.  Instead, the record demonstrates the testimony Daniels refers to was proper evidence establishing the occupations of the investigating officers and the process involved in apprehending Daniels for the charged crime.  Specifically, evidence that Daniels attempted to evade arrest, including that he fled the shopping mall, that he hid in a couch, and that he gave a false name, was properly admissible as circumstantial evidence showing consciousness of guilt.  *State v. Hall*, 1999 MT 297, ¶¶ 43-44, 297 Mont. 111, ¶¶ 43-44, 991 P.2d 929, ¶¶ 43-44.  Simply because otherwise properly admissible evidence might imply Daniels was of bad character does not mean the evidence is objectionable. Therefore, Rule 404, M.R.Evid., is not even applicable here.

¶46    In addition, Daniels provides no citations to where Daniels was directly referred to as a "gang member."  Rather, Daniels objects to implications that could be taken from the testimony.  Such implications are for the jury to assess.  Finally, with respect to comments by witnesses that Daniels was armed or considered "armed and dangerous," these comments

14

were corroborated with testimony by Stacey Parrish (Parrish) that Daniels had a gun in Parrish's home on or about February 18, 2000, and a statement by Mondragon that she saw Daniels with a laser-sighted handgun. This evidence was provided to show that Daniels had access to a gun as used in the robbery. Therefore, because the evidence was admissible, Daniels' counsel was not required to object.

¶47 Accordingly, Daniels' counsel was not ineffective for failing to object. As Daniels does not meet the first requirement of *Strickland*, showing deficient performance, Daniels' claims regarding ineffective assistance of counsel fail on direct appeal.

¶48 We conclude that Daniels' counsel was not ineffective.

¶49 Daniels has not shown error in his trial. Therefore, the judgment of the District Court is affirmed.

/S/ JOHN WARNER

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JIM REGNIER
/S/ JIM RICE